E-FILED
Monday, 09 November, 2026 12:31:07 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION**

| | | |
|---|---|---|
| TY J. BUSHUR,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON LOGISTICS, INC. and<br>THE GOOD NEWS SERVICES CORP.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 2:26-cv-02133-CSB-EIL<br><br>Chief Judge Colin Stirling Bruce<br>Magistrate Judge Eric I. Long |

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE LAW AND JURY DEMAND**

Plaintiff Ty J. Bushur ("Plaintiff"), proceeding pro se, brings this action against Defendants Amazon Logistics, Inc. ("Amazon") and The Good News Services Corp ("GNSC"), as joint employers where applicable, for disability discrimination and failure to accommodate, ADA and Title VII retaliation, ADA interference and improper use of medical information, race and color discrimination, race discrimination and retaliation under 42 U.S.C. § 1981, wage-payment and wage-retaliation violations, workers' compensation retaliatory discharge, whistleblower retaliation, retaliation concerning an educational recommendation, tortious interference with prospective economic advantage, and violations of the Illinois Biometric Information Privacy Act, under the ADA, 42 U.S.C. § 12101 et seq.; Title VII, 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; the FLSA, 29 U.S.C. § 201 et seq.; and supplemental Illinois law. Plaintiff alleges a continuous, documented pattern of discrimination, retaliation, and adverse employment action spanning May 2023 through February 2025.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. § 12117(a), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 216(b), including over Plaintiff's claims under 42 U.S.C. § 1981, and supplemental jurisdiction under 28 U.S.C. § 1367.

2. Venue is proper under 28 U.S.C. § 1391(b). A substantial part of the events giving rise to the claims occurred at or were connected to Amazon WIL4 in Champaign, Illinois, and the relevant employment, delivery, and related events occurred within this District.

## II. PARTIES

3. Plaintiff Ty J. Bushur is a resident of Illinois and is Asian. He was employed by GNSC and alleges Amazon was his joint employer under the ADA and Title VII, and that GNSC was his employer under the FLSA. Plaintiff asserts his claims under 42 U.S.C. § 1981 against both Defendants, as alleged in Count XV.

4. Defendant Amazon Logistics, Inc. is a Delaware corporation operating last-mile delivery through Delivery Service Partners ("DSPs"). Amazon exercised direct control over DSP drivers through its route-assignment software, Netradyne camera surveillance, performance scoring, Tier-3 Defect and coaching-notification systems, and conduct standards incorporated into DSP handbooks, including onboarding training it required before a driver's first route, an individual driver monitoring account (Mentor) it required Plaintiff to use, and paid on-shift investigations it conducted directly with Plaintiff by name and driver ID.

5. Defendant The Good News Services Corp ("GNSC") is an Illinois corporation owned and operated by CEO Edrian Oliver ("Oliver"), who identified himself in writing as "the final escalation point" within the company. GNSC served as Plaintiff's nominal direct employer. Members of the Oliver family who also managed GNSC, including payroll manager Rian Oliver and manager Edrico ("Rico") Oliver, are referred to by their full names; "Oliver" alone refers to CEO Edrian Oliver.

6. Plaintiff alleges Amazon and GNSC jointly employed him. GNSC's CEO confirmed in writing that Amazon's metrics directly affected driver compensation; Amazon issued individual named-driver disciplinary defects, controlled daily routing, monitored drivers via Netradyne, and its coaching notices and Tier-3 Defects were transmitted to GNSC management for action, control over Plaintiff's individual work, compensation, and discipline, not merely general

contractual standards. GNSC admits that Amazon's metrics "affected certain operational aspects of GNSC's business" and were "one factor in operational decisions." (Dkt. 19 ¶¶ 6, 10.)

## III. ADMINISTRATIVE EXHAUSTION

7. Plaintiff signed EEOC Charge No. 440-2025-06808 against GNSC on October 21, 2025, and the EEOC received it on October 23, 2025. Plaintiff signed EEOC Charge No. 440-2026-01767 against Amazon on November 22, 2025, and the EEOC received it on November 23, 2025. The EEOC issued Notices of Right to Sue on April 21, 2026 (GNSC) and February 10, 2026 (Amazon). Both charges were filed within 300 days of Plaintiff's February 10, 2025 termination, and the claims asserted below arise from adverse actions within the charge-filing period, including that termination. The Amazon charge identified Amazon as an employer and alleged that Amazon "jointly participated in discrimination and retaliation based on race, disability, and for engaging in protected activity." True copies of the charges are attached as Exhibits A and B, and true copies of the Notices of Right to Sue are attached as Exhibits C (GNSC) and D (Amazon).

8. On April 6, 2024, Plaintiff submitted a Complainant Information Sheet to the Illinois Department of Human Rights ("IDHR") against GNSC (Control No. 24M0408.07), which IDHR confirmed in writing on April 8, 2024 as received April 6, 2024, constituting protected opposition activity. In it, Plaintiff stated that he had filed discrimination complaints with Amazon "which then goes to my DSP," that his DSP "was aware of the claim," and that he had "complained about unlawful discrimination." He identified GNSC managers Jonathon Benison, Rian Oliver, Edrico ("Rico") Oliver, and Edrian Oliver. The EEOC charge later served on GNSC referenced this submission; GNSC's denial of prior management awareness is disputed and is a factual issue for discovery.

## IV. FACTUAL BACKGROUND

### A. Employment Background and Amazon's Operational Control

9. GNSC extended Plaintiff a conditional offer of employment dated November 8, 2022, for the position of Delivery Associate. Plaintiff began work on or about November 16, 2022,

at Amazon's WIL4 station, when he attended Amazon onboarding training required before his first route.

10. Amazon's control over Plaintiff's work is documented: CEO Oliver's July 24, 2024, email confirmed Amazon's metrics determined bonus eligibility; Amazon's routing system-controlled delivery addresses; Amazon's Netradyne cameras monitored driver activity; and Amazon's coaching and Tier-3 Defect systems generated individual driver notices sent to GNSC management for action. A Week 51, 2022 scorecard shows Amazon Safety and Compliance metrics made up 35% of a driver's standing and affected compensation and advancement. GNSC's Prime Week incentive policy conditioned bonus eligibility on zero Tier Infractions and zero at-fault accidents — both categories generated by Amazon's own systems, directly tying Amazon's scoring decisions to Plaintiff's pay. In June 2023, Plaintiff complained through Amazon's Mentor/eDriving support that these metrics were biased and could be used to manipulate routes, punish drivers, or affect pay, giving Amazon contemporaneous notice of these concerns. At least one other GNSC Delivery Associate assigned to WIL4 also performed deliveries directly for Amazon through its Amazon Flex program on his days off from GNSC, reflecting that Amazon engaged GNSC's drivers directly as well as through GNSC.

### B. Protected Activity and Related Employment Events — July 2023 Through February 2025

11. **Protected Activity, July 12, 2023:** Plaintiff filed an internal complaint with Amazon alleging discrimination, harassment, and retaliation by GNSC management. Amazon's On-Road Risk investigator Angela Hawkins-Cooks acknowledged the complaint on July 14, 2023. No later than July 17, 2023, Amazon possessed Plaintiff's written statement in Incident D89047318, in which Plaintiff identified himself as brown, identified a comparator UPS driver as white, and expressly stated he had been discriminated against, giving Amazon direct, written notice of race/color opposition. Plaintiff thereafter experienced route manipulation, schedule reduction, and increased assignment to penalizing routes, including Indiana routes. An established Amazon-GNSC communication channel, including a shared Oliver-associated email address used

on Plaintiff's onboarding and subsequent Risk communications, supports an inference that this notice reached GNSC as well; the precise forwarding and access records are within Defendants' possession. Plaintiff's April 6, 2024 IDHR submission likewise stated that his DSP "was aware of the claim."

12. The July 17 written response was part of Amazon's handling of the same complaint Plaintiff placed into Amazon's system on July 12, 2023, not a separate complaint or separate protected activity. Plaintiff alleges the July 12 date identifies the initiation of the complaint, while the later incident-numbered communications and written response reflect Amazon's processing and development of that same complaint and further particularized the race/color basis of the opposition already before Amazon.

13. **Protected Activity, Wage Complaints:** On January 16, 2024, Plaintiff documented to Operations Manager Jonathon Benison that Amazon's app was misattributing delivery-location errors to him. On July 24, 2024, Plaintiff wrote CEO Oliver that GNSC's All Day Pay methodology used base-station arrival time rather than last-stop time, systematically denying earned early-finish bonuses; Oliver dismissed this as a 'philosophical' difference without investigation.

14. Plaintiff's wage complaints began earlier and continued. On May 20, 2023, Operations Manager Jonathon Benison emailed GNSC drivers, copying payroll manager Rian Oliver, attaching GNSC's records of drivers' hours for Weeks 19 and 20 and directing drivers to compare them against their ADP punches before Rian Oliver finalized payroll. On May 22, 2023, Plaintiff responded that GNSC's records of his punch and lunch times were inaccurate "on your end," and attached screenshots of his ADP timecard for the May 7–20, 2023 pay period, which reflected 91 hours and 6 minutes of work, more than 40 hours in each workweek. Plaintiff continued to raise the same concern thereafter, calling both Rian Oliver and Edrian Oliver on five occasions to complain that his paychecks did not reflect the hours he had worked. On at least one occasion, Edrian Oliver responded by text message directing Plaintiff to take the issue to Rian Oliver.

15. During Plaintiff's employment, GNSC management employee and dispatcher Chris Middlebrooks told Plaintiff that Amazon compensated GNSC through lump-sum payments for delivery routes, with the amounts based on factors including mileage, package volume, and other route-related variables. Amazon's payments to GNSC for routes and GNSC's compensation of its drivers, including through its All Day Pay program, were separate arrangements. Plaintiff does not possess the Amazon-GNSC agreement, rate schedules, invoices, or payment records, which are maintained by Defendants. The terms of Amazon's payments to GNSC, and their relationship to GNSC's administration of All Day Pay, route assignments, rescues, and completion-time calculations, are matters for discovery. GNSC's written Performance Bonus policy, which governed All Day Pay, promised that a driver who met its eligibility criteria "will be paid a bonus" for that day, and expressly required that the bonus "be included in the regular rate of pay for overtime purposes." On information and belief, GNSC did not follow its own policy: when it did pay the bonus, it did not include it in calculating Plaintiff's regular rate for overtime in workweeks in which he worked more than 40 hours. GNSC's payroll records, All Day Pay calculations, and overtime computations will show how All Day Pay was structured and whether it was included in Plaintiff's regular rate.

16. GNSC disciplined Plaintiff over the same timekeeping dispute. After Plaintiff's July 24, 2024 written complaint that GNSC measured route completion by base-station arrival rather than last-stop time, Plaintiff finished a Danville route early and, after completing his final delivery, logged out of the delivery application on the company phone for the drive back to the station, so that the record would reflect the time his route was completed rather than the time he arrived back at the station. On October 2, 2024, GNSC issued Plaintiff a written Performance Counseling Record stating that the company phone must stay on and signed in for the entirety of the route, describing the logout as a safety issue, and warning that future incidents could lead to termination. GNSC thus disciplined Plaintiff for the very practice he had complained about in writing ten weeks earlier, rather than addressing how it measured route completion for All Day Pay.

17. Amazon's warehouse and loading delays determined when Plaintiff could begin deliveries, which Plaintiff observed firsthand. Based on that experience and on the messages described below, Plaintiff alleges on information and belief that Amazon's operational decisions set or changed drivers' start times and dispatch waves at WIL4, and thus when Plaintiff's workday began and how long it ran. Drivers were required to report at their assigned time even when their carts or dispatch wave were not ready. GNSC announced to its drivers by email on July 14, 2024 that manager Jack Carpenter was taking over the schedule, and listed his number as 331-343-9519. On November 25, 2024, Carpenter texted Plaintiff from that number: "Amazon made some changes so tomorrow your start time is 7:50AM." On the night of December 2, 2024, Carpenter texted, "Sorry for the late notice Ty. Your start time for tomorrow is 8:30." When Plaintiff asked the next morning what 8:30 was considered, Carpenter replied, "Be in at 8:30, 4th wave." Plaintiff responded, "That's cutting my hours since I leave later," and Carpenter replied, "No, you stay out later when you come in later." Carpenter set Plaintiff's start time at 8:30 again for December 4 and December 9, 2024. GNSC also assigned Plaintiff mandatory rescues of other drivers' routes, which extended his workday.

18. Plaintiff's working time was recorded in three separate systems: drivers entered their hours in ADP; GNSC dispatch kept handwritten records of return times; and Amazon kept its own first-delivery, last-delivery, and route-completion data. Plaintiff observed discrepancies of approximately three to five minutes between his actual working time and his recorded or paid time. Whether Plaintiff's required reporting and waiting time, rescue time, and return time were fully recorded and paid, and how GNSC reconciled the three systems in calculating his hours, overtime, and All Day Pay eligibility, are shown by records within Defendants' possession.

19. **Advancement Communications:** On March 9 and March 22, 2024, Plaintiff emailed Benison expressing interest in advancement, receiving no substantive response. GNSC's later EEOC statement that Plaintiff 'neither applied for nor was denied any position' is materially inconsistent with these communications.

20. **Protected Activity, Safety Complaints:** Plaintiff reported a Level 2 dog bite on March 4, 2024, and an assault and baseball-bat threat by customer Kris Lawless on September 5, 2024 (Danville PD Case No. 2024-00007350), to both GNSC and Amazon. Despite these reports, routing continued to assign Plaintiff to dangerous locations. Amazon's On-Road Risk Team, through Hawkins-Cooks, individually investigated the September 5 incident by name and driver ID, and five days later, on September 10, 2024, Amazon issued Plaintiff a Tier-3 Defect for 'Unprofessional Behavior,' citing as its evidence the account of the same customer who had assaulted him. On September 20, 2024, Amazon separately issued a coaching notice for Plaintiff's use of its own 'Unsafe Due to Dog' safety code after routing assigned him to a known dog hazard; CEO Oliver forwarded this to multiple GNSC managers, stating it "negatively impacted his scorecard." Amazon opened similar individualized safety investigations after incidents in November 2023 and February 2024, and Plaintiff's April 2024 follow-up request for records of the earlier dog-attack report went unanswered, together showing a pattern of repeated, individualized Amazon notice preceding the later discipline and termination sequence.

21. **IDHR Protected Activity, April 6, 2024:** Plaintiff's Complainant Information Sheet against GNSC alleged retaliation, wage concerns, disparate treatment, and unsafe conditions. The matter was closed without investigation on October 22, 2024, eight days after Oliver submitted the recommendation described below, but the submission itself constituted protected opposition activity. Separately, as documented in email, GNSC manager Edrico ("Rico") Oliver agreed to provide Plaintiff a referral and then withdrew it.

22. GNSC distributed its employee handbooks to Plaintiff through emails addressed to its management, not to the driver workforce. On November 17, 2023, four months after Plaintiff's July 2023 complaint to Amazon, Benison emailed the November 2023 Employee Handbook with the salutation "Team," copying Edrico Oliver, Edrian Oliver, and Rian Oliver and blind-copying Plaintiff. On May 31, 2024, eight weeks after Plaintiff's April 6, 2024 IDHR submission, Benison emailed an "Updated Employee Handbook" (June 2024) to the same management group, again copying Edrico Oliver, Edrian Oliver, and Rian Oliver and blind-copying Plaintiff. On information

and belief, GNSC did not distribute either handbook to drivers generally in the same manner, and "Team" referred to the recipients of those emails. The June 2024 handbook imposed stricter terms than the November 2023 version, including a 24-hour outer deadline for reporting incidents, a requirement of a manager's signed consent to take a delivery van home, expanded uniform requirements, confidentiality obligations extending to Amazon's data, a ten-hour charge against paid time off for each full day off in place of eight hours, a longer service requirement for tuition-program eligibility, and a new notice that employees' telephone conversations, email, and internet use "may be subject to monitoring at any and all times." The complete distribution lists for both emails, including all blind-copied recipients, are maintained in GNSC's email systems and are matters for discovery.

23. After IDHR received Plaintiff's complaint on April 6, 2024, and before IDHR closed it on October 22, 2024, an IDHR representative called Plaintiff about his complaint against GNSC, and Plaintiff took the call inside his assigned delivery van. The representative told Plaintiff that IDHR was so backlogged that his complaint would not be assigned to an investigator until October. On information and belief, the call occurred in or about April or May 2024, before May 31, 2024. The van was equipped with Amazon's Netradyne in-vehicle camera system. The policies GNSC distributed to its drivers in its November 2023 and June 2024 handbooks state that the system records "the vehicle interior (including occupants of the driver and passenger seats)," and that footage may be uploaded to Amazon or third-party servers "when requested by Amazon or your Company." GNSC's Employee Privacy Notice in the same handbooks states that GNSC may collect "[v]ideo and/or audio recordings and photographs" and "[i]nformation automatically collected through technologies you use when providing delivery services," including "technologies provided by third parties we work with, such as Amazon." On information and belief, the camera system or other monitoring captured the audio of that private conversation, and the recording or its contents reached GNSC management. On another occasion during Plaintiff's employment, while alone in his assigned van, Plaintiff made a brief remark directed toward the Netradyne in-vehicle camera. CEO Edrian Oliver later confronted Plaintiff in a meeting about the

words Plaintiff had said. When Plaintiff asked how Oliver knew what he had said if the vans did not record audio, Oliver answered that he had read Plaintiff's lips. Plaintiff has Hemifacial Microsomia ("HFM"), a congenital condition affecting his facial structure and speech, of which GNSC was aware as alleged below, and which makes his speech difficult to read from the movement of his mouth. On information and belief, Oliver learned Plaintiff's words from audio captured by the in-vehicle camera system. That inference, and the inference that Plaintiff's IDHR call was likewise captured, rest on Oliver's knowledge of words Plaintiff spoke alone in the van, the camera system's capture of the vehicle interior, GNSC's stated collection of audio recordings, GNSC's later denial that its management knew of the IDHR complaint, and the timing of GNSC's revision of its monitoring policy described below. Plaintiff did not consent to the recording of that conversation, nor, on information and belief, did the IDHR representative, whose consent no GNSC policy could supply. No GNSC policy in effect at the time of the call stated that employees' telephone conversations could be monitored; the November 2023 handbook then in force contained no such notice. Only afterward, on May 31, 2024, did GNSC distribute a revised handbook adding, for the first time, a notice that employees' "telephone conversations or transmissions" "may be subject to monitoring at any and all times." A notice issued after the call could not supply consent to its capture. On information and belief, GNSC added that notice to justify, after the fact, monitoring it had already conducted, including of Plaintiff's call with IDHR. Whether the camera system captured audio, who accessed the recording, and when, are shown by device-configuration, upload, and access records within Amazon's, GNSC's, and Netradyne's possession.

24. **Protected Activity, Workers' Compensation, January 22-23, 2025:** While making an Amazon delivery, a customer's vehicle backed over Plaintiff's steel-toed-booted foot, causing an involuntary twisting injury to his right leg and a fall; an unidentified witness was present and is subject to identification in discovery. Plaintiff followed a reporting procedure, including reporting the injury immediately by calling Amazon's incident hotline, which gave Amazon direct notice of the injury on January 22, 2025. While Plaintiff was on the phone with Amazon's incident hotline, the husband of the driver who had run over Plaintiff's foot arrived and walked up to

Plaintiff's van. Because Plaintiff felt unsafe, he drove a short distance away to complete the hotline call. The husband, who on information and belief is a City of Decatur police officer, then followed Plaintiff in his own truck, pulled up to the van, displayed his badge, and yelled at Plaintiff through the window while Plaintiff was still on the hotline call. The husband thus approached Plaintiff twice, the second time by following him in a vehicle. The van's in-vehicle camera recorded the encounter. That recording is among the footage Plaintiff requested from GNSC on January 31, 2025, as alleged below. He was treated at Carle Foundation ER at 2:14 AM on January 23 (classified as a Motor Vehicle Collision, listing Benison as company contact), and pursued workers' compensation benefits.

**C. Post-Injury Employer Conduct**

25. On January 31, 2025, Plaintiff's written request to Benison for the January 22 Netradyne accident footage was denied; Benison directed him to the insurer and copied Oliver. Its preservation and custody are matters for discovery.

26. GNSC's carrier, Nationwide, opened a workers' compensation claim within 48 hours (about 4 days) of the injury. On January 28, 2025, before Plaintiff had given any statement or medical documentation, a Nationwide adjuster left Plaintiff a voicemail stating she would "conditionally deny" the claim, saying she had only video, indicating the carrier had received video of the incident before receiving Plaintiff's own account.

27. GNSC pressed Plaintiff to call the workers compensation carrier during his work shift, treating the call as an assigned light-duty task. On January 27, 2025, CEO Oliver texted: "You are working for me right now, correct? This is what I want you to do now," and directed Plaintiff to make the call from his car and "come back in when completed, and you can go back to monitoring routes". Confirming route monitoring was Plaintiff's light-duty assignment. After Plaintiff retained counsel, Oliver sent repeated escalating messages over January 28-29 demanding Plaintiff personally disclose his attorney's contact information, accusing him of being

"unreasonable" for not doing so, evidence of pressure and retaliatory animus surrounding his exercise of workers' compensation rights.

28. Approximately four days after the injury, while seated at a table with three other people, including coworkers and managers, Plaintiff told the manager on duty that he would call the adjuster after his shift because he was awaiting guidance from his legal counsel and was not comfortable discussing his claim in front of others. The manager then received a phone call from Oliver. Both called Plaintiff insubordinate, and Oliver stated that Plaintiff was being unreasonable for wanting to wait. GNSC sent Plaintiff home and wrote him up for insubordination for awaiting counsel before speaking with the workers' compensation adjuster.

**D. Medical Restrictions, Accommodation Dispute, and Termination**

29. On January 23, 2025, Safe Works placed Plaintiff on Modified Duty, expressly restricting kneeling, prolonged walking on hard surfaces, and lifting/carrying/pushing/pulling over 10 pounds, confirmed again on February 4, 2025, with GNSC receiving the employer copies. GNSC's later EEOC position statement described the lifting and walking restrictions while omitting the written no-kneeling restriction when discussing the February oil-change assignment below.

30. Orthopedic evaluation documented a meniscal tear, ACL degeneration, Grade 2 LCL injury, tendinopathy, partial patellar tendon tear, and Grade 4 chondromalacia, impairments Plaintiff alleges substantially limited walking, kneeling, bending, and lifting and constituted an actual ADA disability.

31. On February 6, 2025, GNSC assigned Plaintiff a van oil-change task requiring kneeling to enter/exit the vehicle, in violation of his written restriction. Plaintiff did not refuse the assignment. He told Operations Manager Jonathon Benison that the task was aggravating his knee, that he would do it, and asked to be accommodated with work that did not require climbing, stepping up, or pivoting. GNSC called the request insubordination, sent Plaintiff home, and docked his pay. GNSC later claimed his doctor had cleared the assignment, but no updated medical

documentation was ever presented to Plaintiff, who was not party to that alleged communication. GNSC had assigned this same task three or four prior times after the restriction took effect, and on February 6 at least one uninjured coworker on the same shift received less physically demanding work. That same day, another injured GNSC worker, who is African American, was performing a task Plaintiff could have performed within his restrictions; Plaintiff's request for comparable work was denied.

32. GNSC's alleged physician-contact justification for the February 6 assignment did not appear in its February 21, 2025, IDES protest and was first raised at the April 2025 ALJ hearing, after Plaintiff's termination. Plaintiff was never provided documentation of an updated medical clearance. Even if driving itself had been medically permissible, that would not resolve the separate written no-kneeling restriction implicated by entering and exiting the van.

33. Route monitoring was an available light-duty accommodation GNSC selectively extended and withdrew from Plaintiff, confirmed in writing by Oliver's own January 27 text. During the same period Plaintiff was sent home without pay for declining tasks that violated his restrictions, another injured GNSC associate was assigned route monitoring and permitted to remain at work, the same accommodation Plaintiff sought and had himself previously performed.

34. Other GNSC employees who were injured on the job received treatment, returned, and kept their jobs. Two other GNSC employees were injured around the same time as Plaintiff; both are African American. While Plaintiff was seeking advancement, including through his March 2024 emails to Benison, GNSC promoted to dispatcher a coworker who is African American and who had approximately four months less tenure than Plaintiff. On information and belief, that coworker had been injured, and GNSC placed him in the dispatcher position to keep him employed rather than separate him, while GNSC sent Plaintiff home without pay and terminated him after his own injury. Approximately 90 percent of Plaintiff's coworkers at WIL4 were African American.

35. Plaintiff told management on February 6 that he had a restriction-clarification medical appointment scheduled for February 11; Safe Works confirmed that appointment by

voicemail on February 10. GNSC terminated Plaintiff that same day, February 10, 2025, one day before the scheduled clarification, and later relied on the resulting documentation gap in its EEOC position statement.

36. Plaintiff separately has HFM, which he disclosed to GNSC both verbally and in writing during his employment and in the underlying EEOC proceedings. Plaintiff's written disclosure included the written statement GNSC required him to submit concerning an incident in which a coworker perceived him as loud and confrontational. In that statement, Plaintiff explained that his HFM affects his speech: his normal speaking voice is soft and difficult to hear, so he must raise his voice to be understood, which others can mistake for yelling. Operations Manager Jonathon Benison accepted that statement. The statement is maintained in GNSC's records and, on information and belief, Amazon's records.

**E. Termination, Pretext, and the University of Illinois Recommendation**

37. GNSC's February 10, 2025 termination letter stated no reason for the termination. On February 10, 2025, at discharge, payroll manager Rian Oliver told Plaintiff verbally that he was being terminated because of the January 22, 2025 incident and for insubordination. Plaintiff asked that the reasons be provided in writing; Rian Oliver refused. Plaintiff then asked GNSC manager Jack Carpenter, who was present, to serve as a witness to the conversation, and Carpenter agreed. GNSC's March 2026 EEOC position statement later cited a cumulative combination of performance issues dating to 2022, the January 22 incident, and the February 6 refusal. Plaintiff alleges this after-the-fact, cumulative explanation, measured against the contemporaneous termination record, supports an inference of pretext. Plaintiff alleges the termination decision was authorized, directed, or ratified by CEO Edrian Oliver as the company's identified final escalation point, or, in the alternative, that managers with retaliatory or discriminatory motive supplied the adverse reports on which any other formal decisionmaker relied without independent investigation; these alternative theories concern the same adverse-action chain and rest on the chronology, Oliver's own written statement of final authority, and decision records within GNSC's control. See

Fed. R. Civ. P. 8(d)(2); Staub v. Proctor Hospital, 562 U.S. 411, 421-22 (2011); Johnson v. Accenture LLP, 142 F.4th 536 (7th Cir. 2025) (reiterating that cat's-paw causation requires unlawful animus by a nondecision maker and proximate causation of the adverse action).

38. GNSC's stated reasons for termination materially expanded across successive proceedings: the February 10, 2025, termination letter stated no reason and GNSC refused Plaintiff's request to state its reasons in writing; the February 2025 IDES protest cited two reasons; the April 2025 ALJ proceeding added the alleged undocumented physician-contact justification; and GNSC's March 2026 EEOC position statement expanded the rationale to at least thirteen categories of alleged misconduct, including a disciplinary history dating to December 2022. Plaintiff further alleges that when GNSC was asked about prior warnings during the February 2025 unemployment process, the response was 'Unknown.' Plaintiff alleges that the materially expanding explanations, compared with the contemporaneous termination record, further support an inference of pretext.

39. GNSC's March 2026 EEOC position statement also acknowledged in footnote 4 that a Benison statement bearing the date '2/7/2024' and referencing '2/6/2024' contained a typographical error and that the correct date was February 7, 2025. Applying GNSC's own correction places the alleged insubordination immediately before Plaintiff's February 10, 2025, termination and within the immediate post-injury, medical-restriction, and accommodation-dispute period. Plaintiff alleges that this corrected chronology further supports causation and pretext.

40. Plaintiff further alleges that GNSC's cumulative-performance rationale is inconsistent with the contemporaneous record. Individual driver scorecards were derived from metrics that fluctuated weekly and did not reflect a stable measure of performance over time. During the same period GNSC now characterizes as reflecting Plaintiff's deficient performance, GNSC's aggregate company rating, a metric that by its nature incorporates each individual driver's performance, including Plaintiff's, remained at "Fantastic Plus" for a sustained, multi-month period. Plaintiff alleges this sustained, favorable aggregate rating is inconsistent with GNSC's later

characterization of him as a performance problem and supports an inference that GNSC's stated rationale was pretextual.

41. On May 3, 2024, weeks after his IDHR complaint, Plaintiff requested a recommendation letter from Benison for the University of Illinois College of Law's MSL program. On August 16, 2024, the University's application system sent a formal reference request to Benison at his GNSC email address, identifying the program. On August 18, 2024, Benison responded that only a VP or higher could provide one. On August 31, 2024, Plaintiff forwarded to Oliver the University's email stating that his application remained incomplete because it was awaiting his recommendation letter, and Oliver replied the same day asking to schedule a time to discuss the request. Before the submission, Plaintiff met with Oliver, told him that he wanted to do his job and needed a reference for the program, and Oliver responded, "the ball is in your court." On October 14, 2024, CEO Oliver personally submitted the recommendation. GNSC describes what it sent as a "memorandum of record dated October 11, 2024, of Plaintiff's trailing six week performance," and asserts that its communications to the program are privileged. (Dkt. 19 ¶ 32 & Aff. Def. 5.) Plaintiff expressly declined to waive his right to access the recommendation. That right, however, applies only to applicants who are admitted and matriculate, and the University's denial of his application foreclosed it. The University rejected Plaintiff's application on December 18, 2024, citing 'academic records, recommendations, and work experience.' Plaintiff alleges, on information and belief based on the timing and GNSC's later characterizations of him, that the recommendation contained materially negative or misleading information; its content remains within GNSC's and the University's possession, subject to discovery.

## V. CLAIMS FOR RELIEF

### COUNT I – Disability Discrimination — Failure to Accommodate ADA, 42 U.S.C. § 12112 — Against GNSC

42. Plaintiff re-alleges all prior paragraphs.

43. Plaintiff's documented right-knee impairments substantially limited walking, kneeling, bending, and lifting. GNSC knew of his written restrictions, placed him on modified

duty, and had assigned route monitoring as light-duty work. Plaintiff alleges GNSC failed to engage in a good-faith interactive process, assigned work conflicting with his documented restrictions, sent him home without pay, and terminated him one day before his scheduled restriction-clarification appointment, while concurrently providing the same route-monitoring accommodation to another injured coworker. On February 6, 2025, Plaintiff did not refuse work; he requested an accommodation within his restrictions, and GNSC responded by treating the request as insubordination and sending him home without pay. GNSC's own employee handbook, in both its November 2023 and June 2024 versions, stated that the Company "will engage in the interactive process" with employees who are unable to perform the essential functions of their job because of a disability; GNSC did not follow its own policy as to Plaintiff. See 42 U.S.C. § 12112(b)(5)(A); Beck v. University of Wisconsin Board of Regents, 75 F.3d 1130, 1135-36 (7th Cir. 1996) (explaining that courts should isolate the cause of an interactive-process breakdown and assign responsibility when a party obstructs, delays, or fails to communicate in good faith).

**COUNT II – Disability Discrimination ADA, 42 U.S.C. § 12112 — Against Both Defendants**

44. Plaintiff re-alleges all prior paragraphs.

45. GNSC terminated Plaintiff nineteen days after his workplace injury and one day before his scheduled medical appointment, expressly citing his conduct during that incident in its EEOC position statement. Plaintiff alleges this framing, combined with repeated conflicting work assignments and the withdrawal of light duty, supports an inference that his disability or perceived impairment was a causal factor in the termination. Amazon's liability is alleged only to the extent its joint-employer status is established.

**COUNT III – Retaliation ADA, 42 U.S.C. § 12203 — Against Both Defendants**

46. Plaintiff re-alleges all prior paragraphs.

47. Plaintiff's requests for accommodation, including his February 6, 2025 request, and his objections to assignments conflicting with his restrictions, were ADA-protected activity.

GNSC terminated him shortly after. The tight injury-restriction-accommodation-termination sequence, GNSC's omission of the no-kneeling restriction in its later defense of the oil-change assignment, and its cumulative post-hoc termination rationale support an inference that this activity was a but-for cause of termination.

**COUNT IV – Retaliation Title VII, 42 U.S.C. § 2000e-3 — Against Both Defendants**

48. Plaintiff re-alleges all prior paragraphs.

49. Plaintiff's July 2023 internal complaint to Amazon and his April 2024 IDHR submission constituted Title VII-protected activity preceding the adverse actions alleged through February 2025. His later 2025 EEOC charges are additional protected activity as to any post-charge retaliation. The documented chronology and pretext facts pleaded above support causation.

50. The adverse actions on which this Count rests include Plaintiff's unpaid removal from work in early February 2025 and his February 10, 2025 termination. GNSC knew of Plaintiff's IDHR complaint, including, on information and belief, through the capture of his in-van telephone call with IDHR described above. The conduct between Plaintiff's protected activity and those actions connects them: the worsening of his working conditions after the IDHR submission; Oliver's "the ball is in your court" remark and the October 2024 recommendation, which Plaintiff also pleads as evidence of retaliatory motive; and GNSC's refusal at discharge to state its reasons in writing, followed by its shifting explanations.

**COUNT V – Race and Color Discrimination Title VII, 42 U.S.C. § 2000e-2 — Against Both Defendants**

51. Plaintiff re-alleges all prior paragraphs.

52. Plaintiff is Asian, a protected class under Title VII. GNSC's WIL4 workforce was predominantly non-Asian, most coworkers being Black (approximately 90 percent). Plaintiff was subjected to disparate treatment in assignments, light-duty availability, advancement, compensation, and discipline. In February 2025, GNSC gave an injured African American coworker work within restrictions while sending Plaintiff home without pay, and on February 10,

2025, GNSC terminated Plaintiff while other injured coworkers returned to their jobs. Comparator proof, workforce composition, assignment, and discipline records for similarly situated employees, is principally within Defendants' possession and will be developed in discovery.

53. Plaintiff further alleges that route sheets assigned to him, reflecting van number, tote count, and package volume, consistently reflected substantially higher package volume than route sheets bearing the names of coworkers whom Plaintiff observed to be African American, and that this pattern was consistent over a sustained period of his employment, a pattern Plaintiff alleges reflects race-based disparity in workload assignment, subject to confirmation through Defendants' route-assignment and personnel records in discovery. Plaintiff retained the printed route sheets for nearly all of his routes, along with copies of route sheets assigned to some coworkers on the same days. The tote, package, and overflow figures on those sheets were generated by Amazon's routing system, while GNSC dispatch assigned the routes among drivers.

**COUNT VI – Wage Retaliation FLSA, 29 U.S.C. § 215(a)(3) — Against GNSC**

54. Plaintiff re-alleges all prior paragraphs.

55. Plaintiff's complaints to GNSC concerned whether he was paid for the time he actually worked. They include his May 22, 2023 written objection that GNSC's records of his punch and lunch times were inaccurate during workweeks exceeding 40 hours; his five telephone complaints to payroll manager Rian Oliver and CEO Edrian Oliver that his paychecks did not reflect his hours worked; his December 3, 2024 written objection that a schedule change was "cutting [his] hours"; and Plaintiff's July 24, 2024, written complaint to CEO Oliver about denied All Day Pay compensation. Together, these complaints were sufficiently clear and detailed for a reasonable employer to understand them as an assertion of rights protected by the FLSA. See Kasten v. Saint-Gobain Performance Plastics Corp., 563 U.S. 1, 14 (2011). They put GNSC on notice. GNSC's written discipline of Plaintiff over the same timekeeping dispute, described above, and his termination were, in part, retaliation for making them. Plaintiff seeks the legal and equitable

relief available under 29 U.S.C. § 216(b) for retaliation, including lost wages and an equal amount as liquidated damages.

**AMAZON JOINT-EMPLOYER ALLEGATIONS Liability Theory Incorporated Into Counts II-V Title VII and ADA — Against Amazon**

56. Plaintiff re-alleges the relevant prior paragraphs to establish Amazon's status as a joint employer; this section states a liability theory and seeks no separate relief. For clarity, Plaintiff pleads two potentially overlapping causation paths: (1) the GNSC management chain described in paragraph 37, including a conventional cat's-paw theory if a biased nondecision maker caused the formal decisionmaker to act; and (2) Amazon's worker-specific inputs into GNSC compensation, discipline, and termination decisions as alleged in paragraphs 57-58. These theories are pleaded in the alternative and depend on discovery concerning knowledge, authorship, transmission, and reliance.

57. Amazon is alleged to be Plaintiff's joint employer under the Seventh Circuit's five-factor framework; control being the most principal factor. See Stokes v. Illinois Department of Corrections, 183 F.4th 947 (7th Cir. 2026). Amazon's worker-specific control includes: the onboarding training it required before Plaintiff's first route, which was his first day of work; its metrics' direct effect on driver compensation; its named-driver Tier-3 Defects and coaching notices transmitted to GNSC for action; its control of daily routing; Netradyne monitoring; its incorporation into GNSC policy; its processing of Plaintiff's July 2023 complaint; its incident hotline, through which Plaintiff reported his January 22, 2025 injury; its start-time, dispatch-wave, and warehouse-readiness decisions, which determined when Plaintiff's workday began, including the November 25, 2024 start-time change attributed to Amazon; its first-delivery, last-delivery, and route-completion records of Plaintiff's working time; its route-based payments to GNSC, which GNSC management described to Plaintiff as calculated from mileage, package volume, and other route variables; its control over Plaintiff's access to the delivery application required to perform his work, including the ability to deactivate accounts and to block a driver's access to the application; its use of in-vehicle camera data, as stated in the policies GNSC distributed to its drivers, "to assess

your ongoing eligibility to perform services under your DSP's contract with Amazon"; GNSC's incorporation of Amazon's rules into its own discipline, including treating as misconduct "[v]iolating any safety procedure communicated by a supervisor or Amazon employee" and treating footwear violations as violations of "Amazon's Uniform Policy"; GNSC's measurement of drivers' work days "as reported in the Flex App"; and Amazon's direct, individualized September 2024 outreach to Plaintiff by name and driver ID. Unlike in Stokes, where the investigating entity did not itself impose discipline, Amazon's individualized investigation of the September 5, 2024, incident was followed five days later by Amazon's own named-driver Tier-3 Defect from that same incident, supporting the joint-employer inference. See Stokes; Frey v. Hotel Coleman, 903 F.3d 671, 676-77 (7th Cir. 2018).

58. Plaintiff alleges Amazon's worker-specific outputs, its Risk, routing, scorecard, coaching, and defect records, were not passive vendor data but were designed for transmission to and use by GNSC in Plaintiff's compensation, discipline, and termination record, placing Amazon-generated records inside the adverse-decision chain. In the alternative, if an Amazon employee with knowledge of Plaintiff's protected complaints generated a negative record with retaliatory or discriminatory motive intending GNSC to act on it, and GNSC did so rely, that Amazon input was a proximate cause of the resulting action. See Fed. R. Civ. P. 8(d)(2). Which personnel could see Plaintiff's protected complaints, and who approved each defect or coaching record, are matters for discovery. This Amazon-to-GNSC pathway is pleaded as proximate causation tied to Amazon's alleged joint-employer participation and worker-specific control, distinct from the conventional subordinate-to-decisionmaker cat's-paw pathway alleged within GNSC's own management chain.

**COUNT VII – Retaliation Concerning University of Illinois Recommendation Title VII, 42 U.S.C. § 2000e-3 — Against GNSC**

59. Plaintiff re-alleges all prior paragraphs.

60. Plaintiff engaged in protected EEO activity before Oliver submitted the October 14, 2024, recommendation. Plaintiff alleges, on information and belief, that it contained negative or misleading information materially affecting his educational opportunity, which, if established, is a

materially adverse retaliatory act. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006). Oliver's "the ball is in your court" remark, GNSC's submission of a performance memorandum in place of the recommendation Plaintiff requested, and GNSC's privilege assertion over that communication support the inference. The contents of that communication are peculiarly within GNSC's and the University's possession.

**COUNT VIII – Retaliatory Discharge for Exercise of Workers' Compensation Rights Illinois Common Law; 820 ILCS 305/4(h) — Against GNSC**

61. Plaintiff re-alleges all prior paragraphs.

62. Plaintiff exercised rights under the Illinois Workers' Compensation Act following his January 22, 2025, injury. Before he had given a statement, the carrier signaled conditional denial while already possessing video; GNSC pressed him to handle the claim as a work assignment; GNSC disciplined him and sent him home for awaiting counsel before speaking with the adjuster; and GNSC terminated him on February 10, 2025, while treatment and restrictions remained active. Illinois recognizes a common-law retaliatory-discharge claim where discharge is causally related to exercising these rights. See Kelsay v. Motorola, Inc., 74 Ill. 2d 172, 181-82 (1978).

63. The short interval between injury and discharge, the imminent Safe Works and physical-therapy appointments, the insubordination write-up for awaiting counsel, Rian Oliver's statement at discharge that the January 22 incident was a reason for the termination, and Oliver's January 27-29 communications together support an inference of causation.

**COUNT IX – Wage Payment and Retaliation Illinois Wage Payment and Collection Act, 820 ILCS 115/2, 5, 14(a), and 14(c) — Against GNSC**

64. Plaintiff re-alleges all prior paragraphs.

65. GNSC's All Day Pay methodology and denial of earned bonuses constituted underpayment of wages or final compensation owed under the IWPCA. Plaintiff seeks unpaid amounts and statutory relief under 820 ILCS 115/14(a). GNSC promised All Day Pay compensation to drivers who met its stated conditions. GNSC did not apply that promise

consistently, paying it on some qualifying occasions and withholding it on others without a stated basis. When Plaintiff met those conditions, GNSC denied the compensation, including by measuring completion from base-station arrival rather than last-stop time, and paid him only for his recorded hours. Plaintiff's actual working time on those days also exceeded the hours GNSC recorded and paid. An earned bonus is recoverable as wages where the employer unequivocally promised it and the employee satisfied its conditions. 56 Ill. Adm. Code § 300.500. GNSC's obligation to pay compensation Plaintiff earned was independent of the amount Amazon paid GNSC for the route.

66. Plaintiff also alleges retaliation under 820 ILCS 115/14(c): his documented complaints to GNSC, including his May 22, 2023 written objection, his five telephone complaints to Rian Oliver and Edrian Oliver, and his July 24, 2024 complaint to Oliver about unpaid compensation were followed by adverse treatment, including GNSC's written discipline of Plaintiff over the same timekeeping dispute, and termination, which Section 14(c) expressly prohibits.

**COUNT X – Whistleblower Retaliation Illinois Whistleblower Act, 740 ILCS 174/15, 20, and 30 — Against GNSC**

67. Plaintiff re-alleges all prior paragraphs.

68. Plaintiff made documented safety disclosures, the dog bite, the baseball-bat assault (also reported to Danville police), and an unsafe vehicle in winter conditions. On the relevant winter workday, GNSC switched both Plaintiff's route and his vehicle at the last minute and without discussion. GNSC reassigned Plaintiff from his regular route to a different, rural route, and moved him from his regular Amazon-branded delivery van, which was equipped with the Netradyne in-vehicle camera system, into a GNSC Sprinter van that had no camera and visibly bald tires. GNSC maintained its own Sprinter vans, including by assigning drivers to take them for oil changes. On the reassigned route, Plaintiff drove the Sprinter down a long, flat, unshoveled driveway covered in several inches of snow, where it lost traction. Because the van had no camera, no recording existed of the conditions that caused it, and GNSC disciplined Plaintiff on its own

account of the incident rather than addressing the vehicle's condition. GNSC's written Performance Counseling Record for the incident is dated January 7, 2025 beside the leadership signature, but bears a separate handwritten date of 11/9/24 in its upper corner, and the employee signature line is blank: Plaintiff never signed it and was not presented with it for signature. On information and belief, GNSC prepared the record and held it for later use against Plaintiff rather than presenting it to him at the time. The resident of the property, in whose driveway the van became stuck, tried to help Plaintiff free the vehicle and witnessed those conditions. GNSC's selective approach to safety extended to driver qualification. GNSC's offers of employment were conditioned on verification of "a valid drivers' license" and "[s]atisfactory completion of a motor vehicle/driving record check." Nevertheless, GNSC allowed another driver, Joshua Candler, to operate its delivery vehicles for an extended period while his driver's license was suspended or otherwise invalid. Candler told Plaintiff his license was not valid after he struck a parked car while driving for GNSC, and GNSC terminated him only after that accident. On information and belief, Edrico ("Rico") Oliver, who managed GNSC's driver scheduling until GNSC announced on July 14, 2024 that he was "no longer with the company effective immediately," knew of Candler's invalid license and continued to schedule him to drive, and GNSC management knew or should have known of it through the verification and record checks it required. GNSC tolerated the invalid license until an accident made it unavoidable, while treating Plaintiff's own safety and medical-restriction objections as insubordination. Plaintiff alleges GNSC inconsistently enforced vehicle-safety standards, at times documenting defects, at other times ignoring them to avoid grounding a vehicle and losing the route, while treating his own safety and medical-restriction objections as insubordination. Vehicle-inspection, defect, and repair records bearing on this pattern are principally within Defendants' possession. Plaintiff pleads protection under the applicable version of the Illinois Whistleblower Act for each disclosure. See 740 ILCS 174/15(a)-(c).

**COUNT XI – Tortious Interference With Prospective Economic Advantage Illinois Common Law — Against GNSC, through CEO Edrian Oliver**

69. Plaintiff re-alleges all prior paragraphs.

70. Plaintiff had a reasonable expectancy of admission to the University of Illinois College of Law's MSL program. He had a pending application, the University had notified him in writing that the application was complete except for his recommendation, and his qualifications were sufficient for admission to a comparable graduate legal studies program at another law school. GNSC knew of the specific opportunity: the University sent its reference request to Benison at his GNSC email address on August 16, 2024; Plaintiff forwarded the University's notice to Oliver on August 31, 2024; and Oliver met with Plaintiff about the request before submitting it. Oliver submitted his recommendation while Plaintiff's IDHR matter was pending and after his protected activity. Plaintiff alleges, on information and belief based on timing and GNSC's later characterizations of him, that the recommendation contained materially false or negative information intended to interfere with that prospective relationship, causing the loss of the opportunity and resulting economic harm. Oliver's "the ball is in your court" remark, GNSC's substitution of a performance memorandum for the requested recommendation, and the reliance of that memorandum on performance measures affected by conditions outside Plaintiff's control support an inference that GNSC acted to harm Plaintiff's application rather than to protect any legitimate interest. The University cited recommendations among its reasons for denial.

**COUNT XII – Biometric Information Privacy Act Violations 740 ILCS 14/15(a), 15(b), 15(d), and 20 — Against Amazon**

71. Plaintiff re-alleges all prior paragraphs.

72. Amazon collected Plaintiff's biometric identifiers through systems mandated for his employment: its Netradyne in-vehicle camera system, and its delivery-confirmation application requiring facial-recognition-based identity verification. Netradyne's own public materials describe its Visual Login System ("VLS") as authenticating drivers from facial images and associating drive time with the driver. Plaintiff alleges, on information and belief, that Amazon or its DSP enabled VLS or an equivalent facial-authentication function in his assigned vehicles, an inference drawn from the attribution of camera events, driving data, and scorecard effects to Plaintiff as a named driver with unique identifiers. Whether and when VLS was enabled, and which entity configured

or received the resulting data, are matters shown by device-configuration and transmission records within Amazon's, GNSC's, and Netradyne's possession. Plaintiff's claim rests on the alleged scan or processing of face geometry to identify him, not on the mere existence of ordinary photographs or video. See 740 ILCS 14/10; Svoboda v. Amazon.com, Inc., No. 25-1361, slip op. at 10-11 (7th Cir. Dec. 17, 2025), amended Mar. 6, 2026. Amazon's own Photos Use and Biometric Information Retention Policy, which GNSC included in its November 2023 and June 2024 employee handbooks, states that Amazon requires users of its delivery application to provide a photo; that Amazon "may derive from your stored photo a scan of your face geometry or similar biometric data"; that drivers of vehicles equipped with Netradyne technology "may have their photos taken by onboard cameras for identity verification and account login purposes"; that Amazon "may derive from your photo Biometric Information to compare to Biometric Information from photos Amazon has on file"; and that Amazon discloses photos to third-party providers including Netradyne. The same policy states that deleting a driver's photo "will block your access to the Amazon delivery application."

73. Plaintiff does not recall signing, and on information and belief did not sign, any written release authorizing Amazon to collect, capture, or obtain his biometric identifiers or information. A notice in an employee handbook is not the informed written release Section 15(b) requires. Amazon's collection, use, and disclosure of this biometric data occurred without a publicly available retention schedule (740 ILCS 14/15(a)), without the required written notice and consent before collection (740 ILCS 14/15(b)), and with disclosure to third parties including Netradyne without informed written consent (740 ILCS 14/15(d)). Amazon's violations were intentional, reckless, or in the alternative negligent. Plaintiff seeks the statutory and equitable remedies authorized by 740 ILCS 14/20, as amended, and, consistent with Clay v. Union Pacific Railroad Co., Nos. 25-2185 et al., slip op. at 17 (7th Cir. Apr. 1, 2026) (holding the 2024 Section 20 amendment applies retroactively), does not seek per-scan damages for repeated collection from the same person by the same method.

**COUNT XIII – Improper Medical Inquiry and Use of Medical Information — ADA, 42 U.S.C. § 12112(d) — Against GNSC**

74. Plaintiff re-alleges all prior paragraphs.

75. GNSC asserted that it contacted Plaintiff's treating provider about his restrictions and that the provider cleared the February 6, 2025 oil-change assignment. Plaintiff was not party to that alleged communication and was never shown any documentation of it. Medical information an employer obtains about an employee's condition must be kept confidential and may be used only as the ADA permits. 42 U.S.C. § 12112(d)(3)(B), (d)(4)(C).

76. On information and belief, GNSC's inquiry was not job-related and consistent with business necessity, because Plaintiff's written restrictions were already in GNSC's possession. GNSC used the purported result of that inquiry to assign Plaintiff work conflicting with his written no-kneeling restriction, to treat his accommodation request as insubordination, and later to justify his termination in the April 2025 ALJ proceeding. Plaintiff suffered concrete harm as a result, including lost pay from his unpaid removal from work and his termination.

**COUNT XIV – Interference, Coercion, or Intimidation — ADA, 42 U.S.C. § 12203(b) — Against GNSC**

77. Plaintiff re-alleges all prior paragraphs.

78. It is unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights protected by the ADA. 42 U.S.C. § 12203(b); see Frakes v. Peoria School District No. 150, 872 F.3d 545 (7th Cir. 2017).

79. Plaintiff exercised ADA rights by requesting accommodation within his written restrictions on February 6, 2025, and by scheduling a restriction-clarification appointment for February 11, 2025. GNSC responded by labeling his request insubordination, sending him home without pay, withdrawing the route-monitoring work it had previously assigned him, and terminating him one day before the clarification appointment. GNSC's conduct was intended to discourage, and had the effect of preventing, Plaintiff's pursuit of a reasonable accommodation.

**COUNT XV – Race Discrimination and Retaliation — 42 U.S.C. § 1981 — Against Both Defendants**

80. Plaintiff re-alleges all prior paragraphs.

81. Section 1981 guarantees all persons the same right to make and enforce contracts, including the making, performance, modification, and termination of contracts and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. 42 U.S.C. § 1981(a)-(b). Section 1981 also prohibits retaliation against a person who opposes race discrimination. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008). Plaintiff's employment with GNSC was a contractual relationship protected by § 1981.

82. **Discrimination.** Plaintiff is Asian. But for his race, Plaintiff would not have been assigned consistently heavier routes than African American coworkers, denied work within his restrictions that GNSC provided to an injured African American coworker, passed over for promotion in favor of a less-tenured coworker, or terminated while injured coworkers returned to their jobs. See Comcast Corp. v. National Ass'n of African American-Owned Media, 589 U.S. 327 (2020).

83. **Retaliation.** Plaintiff opposed race discrimination in his July 2023 written complaint to Amazon, in which he identified himself as brown and a comparator driver as white, and in his April 2024 IDHR submission. Amazon knew of the July 2023 complaint because it received, acknowledged, and processed it. After that complaint, Plaintiff experienced route manipulation, schedule reduction, and assignment to penalizing routes; Amazon issued him a September 10, 2024 Tier-3 Defect citing the account of the customer who had assaulted him and a September 20, 2024 coaching notice that GNSC's CEO stated "negatively impacted his scorecard"; and GNSC terminated him on February 10, 2025.

84. Amazon is liable under § 1981 for its own conduct impairing Plaintiff's contractual relationship with GNSC, including the routing, scoring, coaching, and defect records it generated and transmitted to GNSC for use in Plaintiff's compensation, discipline, and termination, whether or not Amazon is found to be Plaintiff's employer under Title VII or the ADA. Plaintiff's § 1981

claims are subject to a four-year limitations period, see Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004), and do not require administrative exhaustion.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against both Defendants, jointly and severally where applicable, for:

a. Compensatory damages for lost wages, back pay, front pay or reinstatement, lost benefits, and lost earning capacity;

b. Compensatory damages for lost educational opportunity, including the value of the MSL degree and associated career advancement;

c. Compensatory damages for emotional distress, humiliation, damage to professional reputation, and pain and suffering;

d. Punitive damages for Defendants' intentional, willful, and malicious violations;

e. Statutory damages and other relief under 740 ILCS 14/20 against Amazon;

f. Reinstatement or, in the alternative, front pay;

g. Reasonable attorneys' fees and costs under 42 U.S.C. § 12205, 42 U.S.C. § 2000e-5(k), 42 U.S.C. § 1988, and 29 U.S.C. § 216(b);

h. Liquidated damages under 29 U.S.C. § 216(b);

i. Pre- and post-judgment interest;

j. Evidentiary, preservation, or sanctions relief under Fed. R. Civ. P. 37(e) as warranted;

k. An injunction against further discrimination, retaliation, or harassment;

l. Statutory penalties and other relief under the IWPCA and Illinois Whistleblower Act;

m. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 and the Seventh Amendment, Plaintiff demands a trial by jury on all issues so triable.

## EXHIBITS

Exhibit A — EEOC Charge No. 440-2025-06808 (GNSC)

Exhibit B — EEOC Charge No. 440-2026-01767 (Amazon)

Exhibit C — EEOC Notice of Right to Sue, Charge No. 440-2025-06808 (GNSC)

Exhibit D — EEOC Notice of Right to Sue, Charge No. 440-2026-01767 (Amazon)

## VERIFICATION UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. § 1746, I, Ty J. Bushur, declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my knowledge, information, and belief.

Executed on __October 22__, 2026, at Chicago, Illinois.

Dated: __October 22__, 2026

Respectfully submitted,

s/Ty J. Bushur

Ty J. Bushur, Plaintiff, pro se
3472 N. 1300th St.
Mason, Illinois 62443
Telephone: 815-317-6510
tybushur@gmail.com

# EXHIBIT A

EEOC Charge No. 440-2025-06808 (The Good News Services Corp.)

Bushur v. Amazon Logistics, Inc., et al., No. 2:26-cv-02133-CSB-EIL

EEOC Received: October 23, 2025

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (Sept. 1, 2017)

For Official Use Only – Charge Number: 440-2025-06808

| | |
|---|---|
| **Personal Information** | First Name: Ty MI: J Last Name: Bushur<br>Address: 525 s state st Apt.: ___<br>City: Chicago County: Cook State: IL Zip Code: 60601<br>Phone: 331-291-1979 Home ☒ Work ☐ Cell ☐ Email Address: tybushur@gmail.com |
| **Who do you believe discriminated against you?** | Employer ☒ Union ☐ Employment Agency ☐ Other Organization ☒<br>Organization Name: DSP - Good news services [redacted]<br>Address: 1201 newton dr Suite: ___<br>City: Champaign State: IL Zip Code: 61802 Phone: 214-803-7215 |
| **Why you believe you were discriminated against?** | Age ☐ Color ☒ Disability ☒ Genetic Information ☐ National Origin ☐<br>Race ☒ Religion ☐ Retaliation ☒ Sex ☐ |
| **What happened to you that you believe was discriminatory?** | **Date of most recent job action you believe was discriminatory:** January 28, 2025<br>**Describe briefly <u>each job action you believe was discriminatory</u> and when it happened (estimate).** 4/6/24<br>On ~~July 12 20~~23, I filed a discrimination complaint with the Illinois Department of Human Rights. After that filing, my working conditions worsened and management became increasingly hostile. I was assaulted by a customer during a delivery and reported it to Amazon, but was sent back to the same address multiple times afterward. Later, I applied for a better position but was overlooked, and the job was given to a Black individual, even though I was qualified and not Black. The retaliation continued through my termination on February 10, 2025.<br><br>On January 22 2025, I sustained a work-related foot and knee injury while performing delivery duties. The company's doctor placed me on light-duty restrictions but management forced me to perform tasks outside those restrictions and refused to accommodate.Other African employees with injuries were accommodated with lighter tasks, while I was sent home without work even though suitable tasks were available. I contacted the doctor's office to clarify my restrictions, but before the updated accommodation could be completed; 1/28/25<br>I was terminated on February 10 2025. The company's insurer also denied my claim as "not in scope of work" and later called it "self-inflicted."<br>I believe these actions were retaliation for my prior IDHR complaint and for requesting accommodations related to my injury, and also shows discrimination based on race and failure to accommodate under the ADA. |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on Age, Color, Disability, Genetic information, National Origin, Religion, Sex, or based on retaliation for: filing a charge of employment discrimination; helping in someone else's complaint about job discrimination; or complaining to the employer about job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br>**Signature:** Ty Bushur **Date:** 10/21/25 |

# EXHIBIT B

EEOC Charge No. 440-2026-01767 (Amazon Logistics, Inc.)

Bushur v. Amazon Logistics, Inc., et al., No. 2:26-cv-02133-CSB-EIL

EEOC Received: November 23, 2025

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (Sept. 1, 2017)

For Official Use Only – Charge Number: 440-2026-01767

| | |
|---|---|
| **Personal Information** | First Name: Ty MI: J Last Name: Bushur<br>Address: 525 s state st Apt.: ____<br>City: Chicago County: Cook State: IL Zip Code: 60605<br>Phone: 331-291-1979 Home ☒ Work ☐ Cell ☐ Email Address: tybushur@gmail.com |
| **Who do you believe discriminated against you?** | Employer ☒ Union ☐ Employment Agency ☐ Other Organization ☒<br>Organization Name: Amazon WIL4<br>Address: 1201 newton dr Suite: ____<br>City: Champaign State: IL Zip Code: 61802 Phone: 214-803-7215 |
| **Why you believe you were discriminated against?** | Age ☐ Color ☒ (crossed out) Disability ☒ Genetic Information ☐ National Origin ☐<br>Race ☒ Religion ☐ Retaliation ☒ Sex ☐ |
| **What happened to you that you believe was discriminatory?** | **Date of most recent job action you believe was discriminatory:** February 10, 2025<br>**Describe briefly <u>each job action you believe was discriminatory</u> and when it happened (estimate).**<br>I filed a discrimination complaint with the Illinois Department of Human Rights. After that filing, my working conditions worsened, and management became increasingly hostile. I was assaulted by a customer during a delivery and reported it to Amazon but was sent back to the same address multiple times afterward. I asked multiple times to be taken off that route. Amazons' performance monitoring cameras and safety scoring systems contributed to impose negative actions taken against me before and after my injury. These systems directly informed disciplinary decisions by the DSP. My work conditions became retaliatory on multiple occasions after I mentioned wage theft and unsafe work conditions. The retaliation continued through my termination on February 10, 2025. Multiple routes I was put on were set up for me to antagonize me, dealing with the same customers over and over who deliberately created a hostile environment. I was bitten by a dog, I was verbally abused, I had told management about my HFM condition.<br><br>Amazon / DSP had placed me in an unsafe truck to deliver routes. that day was snowy and in the country. Most maintenance on the trucks were never kept up to safety standards. I was placed in a truck that had bald tires, and on my route at a stop I got stuck and I was written up / disciplined for it. I got stuck on a flat road that was not shoveled, and snow was about 2 inches.<br><br>I was terminated on February 10, 2025. I believe Amazon jointly participated in discrimination and retaliation based on race, disability, and for engaging in protected activity.<br>I believe these actions were retaliation for my prior IDHR complaint, safety concerns, and reporting of hostile encounters against me, and for requesting accommodations related to my injury, and also shows discrimination based on race and failure to accommodate under the ADA. |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on Age, Color, Disability, Genetic information, National Origin, Religion, Sex, or based on retaliation for: filing a charge of employment discrimination; helping in someone else's complaint about job discrimination; or complaining to the employer about job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br>**Signature:** Ty Bushur **Date:** 11/22/2025 |

# EXHIBIT C

EEOC Notice of Right to Sue, Charge No. 440-2025-06808 (The Good News Services Corp.)

Bushur v. Amazon Logistics, Inc., et al., No. 2:26-cv-02133-CSB-EIL

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/21/2026

**To:** Mr. Ty J. Bushur
525 S. State Street 1726
Chicago, IL 60606

Charge No: 440-2025-06808

EEOC Representative and email: GRACE GOUNTANIS
INVESTIGATOR
GRACE.GOUNTANIS@EEOC.GOV

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2025-06808.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
04/21/2026

Amrith Kaur Aakre
District Director

**Cc:**
Good News Services
4420 white ash LN
NAPERVILLE, IL 60564

Amy Bennett
Ogletree Deakins
300 N. Meridian St, Suite 2700
Indianapolis, IN 46204

Sharlee Little
Ogletree Deakins
300 N. Meridian Street, Suite 2700
Indianapolis, IN 46204

Katie Bayt
Ogletree Deakins
300 N. Meridian St, Suite 2700
Indianapolis, IN 46204

Please retain this Notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2025-06808 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2025-06808 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

## NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- **Only one** major life activity need be substantially limited.
- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

# EXHIBIT D

EEOC Notice of Right to Sue, Charge No. 440-2026-01767 (Amazon Logistics, Inc.)

Bushur v. Amazon Logistics, Inc., et al., No. 2:26-cv-02133-CSB-EIL

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Chicago District Office**
230 S Dearborn Street
Chicago, IL 60604
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 02/10/2026

**To:** Mr. Ty J. Bushur
525 S. State Street 1726
Chicago, IL 60606
Charge No: 440-2026-01767

EEOC Representative and email: GRACE GOUNTANIS
INVESTIGATOR
GRACE.GOUNTANIS@EEOC.GOV

---

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 440-2026-01767.

On behalf of the Commission,

Digitally Signed By:Amrith Kaur Aakre
02/10/2026

Amrith Kaur Aakre
District Director

**Cc:**

Sam Hyde
Greenberg Traurig
400 Capitol Mall, Suite 2400
Sacramento, CA 95814

NA NA
1201 Newton Dr
Urbana, IL 61802

Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 440-2026-01767 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 440-2026-01767 to the District Director at Amrith Kaur Aakre, 230 S Dearborn Street , Chicago, IL 60604.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

### "Actual" disability or a "record of" a disability

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- **Only one** major life activity need be substantially limited.
- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**CERTIFICATE OF SERVICE**

I hereby certify that on __October 22__, 2026, I served a true and correct copy of the foregoing Plaintiff's Second Amended Complaint for Violations of Federal and State Law and Jury Demand, with its Exhibits A through D, by electronic mail, pursuant to each counsel's written consent to electronic service, upon the following attorneys:

**Counsel for Defendant The Good News Services Corp.**
Heidi K. Durr
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
heidi.durr@ogletree.com

**Counsel for Defendant Amazon Logistics, Inc.**
Stephanie L. Sweitzer
Jeronimo Simonovis
Morgan, Lewis & Bockius LLP
stephanie.sweitzer@morganlewis.com
jeronimo.simonovis@morganlewis.com

________________________________
s/Ty J. Bushur
Ty J. Bushur, Plaintiff, pro se
3472 N. 1300th St.
Mason, Illinois 62443
Telephone: 815-317-6510
tybushur@gmail.com